ALEXANDRIA BILLIARD COMPANY, Appellant, v. J. MILOSLOW-SKY, Appellee.

**Landlord and tenant:** AGREEMENT TO LEASE: VALIDITY. A definite written agreement to make a lease of property upon certain fixed terms is binding, though no formal lease is ever executed; but before a party may rely upon such an agreement he must show a meeting of the minds of the parties upon all the terms and conditions of the intended lease, and full performance on his part and refusal of the other party to execute the lease.

**Same:** AGREEMENT TO LEASE: BREACH. A contract for a lease providing that the premises shall be sublet with consent of the owner upon terms satisfactory to the parties was not violated by refusal to execute a lease containing terms imposed by the owner different from those contemplated by the original agreement.

**Same:** AGREEMENT TO LEASE: WHEN EFFECTIVE. Where it was understood by the parties that there was to be no binding contract until a formal written agreement was executed no contract existed until this provision was complied with.

**Same:** AGREEMENT TO LEASE: BREACH: EVIDENCE. In this action to recover damages for breach of a contract to lease property containing a provision for subletting upon terms satisfactory to the parties, remodeling to make the premises suitable for a certain business and consent of the owner, the evidence fails to show that the lessee was at fault in not executing the lease and that there was an agreement as to its terms.

**Same:** AGREEMENT TO LEASE: ESTOPPEL. Where a sublessee had the absolute right to refuse conditions imposed by the owner in case of subletting, the fact that he made different objections to the pro-

posed lease at the trial than at the time of the agreement was not ground for estoppel; there having been no meeting of minds on that question.

*Appeal from Polk District Court.*—HON. CHAS. S. BRADSHAW, Judge.

TUESDAY, NOVEMBER 24, 1914.

ACTION at law to recover damages for a breach of contract to lease certain premises in the city of Des Moines. Trial to a jury, directed verdict for defendant, and plaintiff appeals.— *Affirmed.*

*Oscar Strauss* and *Don B. Shaw,* for appellant.

*Howe & Lyon* and *Parsons & Mills,* for appellee.

DEEMER, J.—The estate of C. Youngerman, Incorporated, is the owner of the premises in controversy, and in March of the year 1910 it leased the same by written lease to Abe Frankel and Nate Siegel for the term of ten years. The lease provided, among other things, that the lessees would—

not sell this lease nor underlet the entire premises without the written consent of the party of the first part, but may sublet portions of said building with the consent of the said party of the first part being first obtained thereto, provided, however, that the same shall not be sublet to any tenant who will use the said premises for any unlawful purpose or any housekeeping or for any business that shall be a detriment to the building or for any business that shall create a wear and tear more than the ordinary business of stores or offices or light manufacturing, and that they would, at the expiration of this lease, surrender the possession of said premises to the party of the first part without further notice to quit in as good condition and repair as the same are now in or may be placed in by the party of the first part, unavoidable wear and tear alone excepted.

The lessor agreed to make certain specified alterations and changes in the building in conformity to certain specifications made by named architects, and also to keep the roof of the building in repair; but other repairs were to be made by the lessees. Lessees were to pay for the light and heat of the building, and they also agreed that they would—

not allow the said premises to be damaged or depreciated in value by any act of negligence of theirs or their employés or any subtenant to whom they may lease the same under the provisions of this lease, in any manner whatever, and use all proper care and diligence in taking care of the same and at the expiration of this lease to surrender the said premises in a clean, presentable condition upon removal therefrom; and to comply with the ordinances of said city relative to the sanitary condition of said premises and the removal of snow and other obstructions from the sidewalk.

Frankel and Siegel assigned this lease to the plaintiff, a corporation doing business in the city of Des Moines, with the consent of the original lessor. Some time in September of the year 1912, plaintiff entered into negotiations with defendant to lease a part of the building leased by them, and pursuant thereto they entered into a memorandum of agreement, which reads as follows:

This agreement made and entered into on this 5th day of September, A. D. 1912, witnesseth: That whereas the Alexandria Billliard Company, a corporation duly organized under the laws of the state of Iowa, hereinafter known as party of the first part, holds a lease for a period of eight years from the 25th day of June, 1912, from the C. Youngerman Estate, Incorporated, on the premises locally known as 513 and 515 Locust St., Des Moines, Iowa, and whereas J. Miloslowsky, hereinafter known as party of the second part, is desirous of subletting the first floor of the building upon the said property for the unexpired portion of the lease, it is therefore mutually agreed by and between the parties hereto that party of the first part agrees to sublet said first floor of said premises save and except that portion of the said first floor now occupied by a saloon, and a ten-foot entrance off the

west side of said premises leading to the stairway to the second floor, where first party contemplates moving his billiard hall, and said second party agrees to pay to said first party or his assigns, for the use of first said floor, the sum of $350 per month. It is understood that said first party is to build their own partitions for the ten-foot entrance heretofore mentioned, at their own expense. It is further understood by and between the parties hereto that said second party is to use said first floor for a moving picture business or any other legitimate business, and that this contract is to be of no force and effect unless said subletting herein contemplated is consented to by the landlord, the C. Youngerman Estate, Incorporated. It is further understood by and between the parties hereto that the principal use to which the second party contemplates putting said first floor is a moving picture business, and unless said pillars supporting the roof of the said first floor can be removed so as to make the room suitable to said business, then and in that event this contract is to be of no force or effect. Second party further agrees to surrender back to the first party said premises in the same condition as that in which he received them at the termination of sublease. Said second party as a further consideration agrees to pay to the first party a bonus of $5,000 over and above the monthly rental herein provided for. Said $5,000 to be paid when the contract of said lease is executed and is satisfactory to both parties. It is further understood and agreed that this contract is to be of no force and effect if the C. Youngerman Estate, Incorporated, does not agree to the remodeling necessary to put said building in condition for the moving picture business, and said contract to be of no force and effect if the city of Des Moines refuses to license for the operation of the moving picture business in said premises hereinbefore described.

Witness our hands at Des Moines, Iowa, this 5th day of September, A. D. 1912.

[Signed]    Alexandria Billiard Co.,
By A. Frankel, Pres.,
Party of the First Part.
J. Miloslowsky,
Party of the Second Part.

It will be observed that this is a conditional agreement, and that it contemplated the execution of a subsequent written

lease between the parties; a part of the consideration to be paid upon the execution of a lease satisfactory to both parties. Plaintiff pleaded that all the conditions of this agreement were fully performed by it, and that it tendered defendant a written lease in accord with the terms of the preliminary agreement, and that the Youngerman Estate consented to the necessary remodeling of the building to put it in condition for defendant's use, according to the memorandum of agreement. It also pleaded that:

A lease was prepared which was satisfactory to both parties, and which this plaintiff was willing and offered to execute; that said defendants refused to execute said lease and perform the conditions of said agreement set out in plaintiff's original petition, demanding that the said C. Youngerman Estate, Incorporated, agree to guarantee the furnishing of heat in said building and perform other conditions not required or set out in said written agreement between plaintiff and defendant, basing his refusal to perform the conditions of said agreement to be performed by him solely and only upon the refusal of the said C. Youngerman Estate, Incorporated, to comply with conditions which were not embodied in said agreement; that defendant thereby prevented and waived further compliance with the conditions of said contract and agreement.

Defendant admitted the execution of the memorandum of agreement, but denied each and every other allegation of the petition and an amendment thereto. After plaintiff had introduced all his testimony in support of its pleadings, defendant moved for a directed verdict, and this motion was sustained; a verdict was accordingly directed, and judgment rendered thereon. The appeal is primarily from the ruling on the motion.

It seems that, when the matter of subleasing a part of the property to the defendant was presented to the owner, it prepared and submitted to the parties the following memorandum:

The Estate of C. Youngerman, Incorporated, hereby agrees and consents that the Alexandria Billiard Company may sublet to J. Miloslowsky part of the building known as 513-515 West Locust St., described in the lease and in accordance with the terms thereof, which lease is hereto attached upon conditions as follows:

(1) That the changes and alterations to be made by the said J. Miloslowsky shall be under the direction and supervision of the architects, Proudfoot, Bird & Rawson, and shall be satisfactory to said architects that the strength of the building is not in any way impaired thereby, and that the expense of the architects shall be paid by the said J. Miloslowsky.

(2) That J. Miloslowsky shall at the expiration of its lease replace iron columns in the same place they now are, and also put the entire room in the condition it now is, if so demanded by the Estate of C. Youngerman, Incorporated.

(3) That J. Miloslowsky shall pay the rentals under said lease direct to the Estate of C. Youngerman, Incorporated, and same be applied upon the rent of the lease between the Estate of C. Youngerman, Incorporated, and Frankel & Siegel; the Alexandria Billiard Company being successors of said firm Frankel & Siegel.

(4) That the consent hereby given shall not in any way release Frankel & Siegel or the Alexandria Billiard Company from any obligation or liability under their lease with the Estate of C. Youngerman, Incorporated, for entire building.

(5) That the said Alexandria Billiard Company, or Frankel & Siegel, shall assign to the Estate of C. Youngerman, Incorporated, the lease with J. Miloslowsky, as collateral security for the payment of the rent agreed upon in the said original lease above mentioned.

(6) That in case there is an increase in the insurance upon the building, by reason of the occupancy of J. Miloslowsky, said Miloslowsky shall pay to the Estate of C. Youngerman, Incorporated, such additional cost of insurance.

(7) That the said Miloslowsky will not use or permit the use of phonographs, graphophones, or other similar instruments upon said premises.

This agreement was not signed by any one representing the owner, or by the defendant, and it embodied many propo-

sitions not covered by the original agreement between the parties plaintiff and defendant; and defendant, although expressing himself as apparently satisfied, took it to read it over again, and then refused to sign it or the lease. It seems that the parties plaintiff and defendant attempted to draw up a written lease in accordance with the terms of the preliminary agreement before any conference was had with the owners of the building or its representative, and that an attorney for the plaintiff attempted to formulate a lease which was satisfactory to the defendant, and that, upon a second attempt to prepare such a lease, defendant expressed himself as satisfied therewith; but, as the owner had not yet been consulted, neither party signed the same. On the same day this lease was prepared, a conference was had with a representative of the owner, and the written statement of the owner which we have heretofore set out was submitted to defendant, and it is claimed that, after he had read this, he expressed satisfaction therewith. We here quote the testimony as to what was said at this time, and as to what the defendant subsequently did.

Frankel, representing the plaintiff, said:

The agreement that Mr. Youngerman presented to Miloslowsky was discussed there. There were some things that Miloslowsky wanted Mr. Youngerman to do that Youngerman didn't feel like doing, and putting the same in the same shape it was after the lease was up as it was when he took it. . . . Miloslowsky finally said it was all right; that he was coming up to sign it. I saw Miloslowsky the next day in regard to this contract, and he had a talk with him. He said that the deal was off. That Mr. Youngerman didn't want to do what he wanted him to do, or something like that.

On cross-examination he said:

Mr. Miloslowsky and I both expressed ourselves in Mills' office that we were satisfied with the lease, but I didn't sign it up at that time because Mr. Miloslowsky was not ready to sign it, I guess. He didn't sign it. There was nothing special said about finding out whether Youngerman would permit

the thing to be done in that way. . . . The property is owned by the Youngerman Estate. Exhibit 3 is what I refer to as Youngerman's consent in writing. Mr. Youngerman hasn't signed it. There was one that was signed by Mr. Youngerman. . . . I don't know where the paper is that was signed by Mr. Youngerman. I thought maybe I left it at Mr. Strauss' office, but I don't know where it is right now. I think that the last lease was drawn after Miloslowsky saw Youngerman's consent. When I say that I saw Youngerman's consent, I refer to Exhibit 3. There must have been more than one paper, but not at that time. I didn't see Youngerman sign any consent. . . . Exhibit 3 is not the only objections or conditions that I saw Mr. Youngerman have there at the time we were in Mr. Strauss' office. The one I saw was signed by the C. Youngerman Estate. I went to Mills' office and drew up this agreement, the one that Miloslowsky and I signed, that I would enter into a lease. The lease was written and after that I went up to Strauss' office. Q. Then these objections that I hold in my hand, or this statement from Mr. Youngerman that I hold in my hand, marked Exhibit 3, were presented by Mr. Youngerman there at Mr. Strauss' office, after you had been to Mr. Mills' office and had Exhibit 2 drawn, isn't that right? A. Yes, sir. No lease was drawn up after that, and I didn't see any. After this meeting at Strauss' office, the paper Exhibit 4 was not presented to me by Miloslowsky. Miloslowsky did not, after the meeting at Strauss' office, present me with any paper, nor did I tell him to take that over to Youngerman's office, and he did not say he took it over to Youngerman's office, and then came back to me, and said that Youngerman would not do it, or something of that kind. I met him in the office of my billiard hall after that, and he talked with me, but never presented any paper. He did say at that time that the deal was off. He told me that he had some objections, and he and I talked something of going to see Youngerman. He came back to see me after that, saying that Youngerman would not do something that he wanted done. He said he wanted Youngerman to do certain things before he signed the lease. I didn't see him have any objections at that time. He said that he would see Mr. Youngerman. There was nothing said in the meeting in my billiard hall about Miloslowsky insisting on having a provision in the lease that his rights should not be affected by a breach of the lease between me and Siegel on

the one side and the C. Youngerman Estate on the other, and that the present owner of the building should recognize Miloslowsky rights under the lease, and that he should consent to all the terms and conditions of the sublease. I didn't know that Miloslowsky was insisting upon a provision in the lease that repairs should be made by the owner. He was to make all his own repairs. In the last lease that was to be signed, he was to do his own remodeling. I never heard Miloslowsky say anything about insisting that the owner of the property should make the repairs. I was furnishing heat for the building. The paper I saw that was signed by the Youngerman Estate was at Mr. Strauss' office. It was not delivered to me by Mr. Youngerman or by any one for him. It was delivered to Mr. Strauss. I don't know where it is now. The conversation that I have referred to as having been at the billiard hall was after the time that we were all at Mr. Strauss' office.

The general manager of the Youngerman Estate testified that he was in Strauss' office at the time mentioned by Frankel, and he said:

Well, there was nothing of consequence said by Mr. Miloslowsky in regard to this instrument (Exhibit 3) as to its being satisfactory or otherwise, only he said he would take it and think it over that evening. The instrument that I had there was not signed by him. Mr. Ayres: What was discussed there in regard to this matter between Mr. Miloslowsky and Frankel, and what, if anything, did you offer to do, or say you would do, in regard to subletting or remodeling? A. There was nothing said: I did not offer to remodel anything. Everything was all satisfactory to me, according to Exhibit 3, in regard to allowing them to sublet the premises to Miloslowsky and in regard to remodeling by Miloslowsky of the premises. I don't remember anything said by them in regard to that being satisfactory to them. . . . The agreement was read over by Mr. Miloslowsky there. I don't remember whether it was discussed there or not. Mr. Ayres: When you got through and started to leave, what, if anything, was said in regard to this contract being satisfactory or otherwise by Mr. Miloslowsky? A. It was satisfactory. He said that he would take this evening to think it over and give me an answer in the morning. He had reference to the conditions whereby we were giving consent.

On cross-examination he said:

Exhibit 5 is a copy of the lease between the Youngerman Estate and the Alexandria Billiard Company, dated March 30, 1910, and it was on account of this lease that we had this made in Mr. Strauss' office. It was for the purpose of considering the matter of consenting to the subletting by the Alexandria Billiard Company to Mr. Miloslowsky. I don't know who wrote Exhibit 3. The last paragraph was written by Mr. Strauss. I don't know where all of Exhibit 3 was prepared. The last paragraph was prepared by Mr. Strauss himself in his own office. I don't know as to whether this Exhibit 3 is the original document, which I had before me at that time. . . . The one that I had before me at that time was the one on which part was written by Mr. Strauss with pen. There was no other there at that time in which a paragraph had been written by Mr. Strauss with pen. . . I did not sign a statement of conditions upon which I suggested that the Youngerman Estate might consent to the lease or would insist upon being attached to the lease. I don't know whether such a statement was signed by the Alexandria Billiard Company. I don't know whether it was signed by Miloslowsky. Miloslowsky took it away with him that night. The document that he took away was Exhibit 3, and I have not seen it from that time until to-day. I understand that, when he took it away, he wanted to read it again and consider it over night. He did not return it to me or any other paper signed. The lease was not made. . . . No lease was ever signed by and between this party. The Youngerman Estate did not give its consent to any lease to any of the parties to this action.

On redirect the witness said:

When we were at Mr. Strauss' office, this agreement (Exhibit 3) was discussed there. There was no objection to this paragraph in Exhibit 3 'that the changes and alterations to be made by J. Miloslowsky shall be under the direction and supervision of the architects, Proudfoot, Bird & Rawson, and shall be satisfactory to said architects; that the strength of the building is not in any way impaired thereby; and that the expense of the said architects shall be paid by the said J. Miloslowsky.' Mr. Miloslowsky read that there and saw it. Nothing was said as to paragraph 2 of Exhibit 3 'that J.

Miloslowsky, at the expiration of this lease, shall replace the iron columns in the same place they now are; also put the entire room in the same condition it now is, if so demanded by the Estate of C. Youngerman, Incorporated.' . . . They had this instrument (Exhibit 3) and read it over, and it was satisfactory to me with the exception of the last paragraph, and I told Mr. Strauss to add that in regard to the music box. I don't know that Mr. Miloslowsky said anything about any one preparing this Exhibit 3. Mr. Miloslowsky was there when I came in. Nothing more was said than that it was satisfactory. As I said before, I asked Mr. Strauss to add this last paragraph in regard to noiseless music boxes. Mr. Ayres: Then, as I understand it, this proposition or agreement was submitted to you by Mr. Frankel and Miloslowsky when you came up there? A. Yes, sir. Mr. Ayres: What did you say in regard to that? A. It was satisfactory. The Court: That is what you said? Witness: Yes, sir. Defendant conceded that it was satisfactory to Mr. Youngerman.

On recross-examination the witness said:

I don't know who prepared Exhibit 3. I saw it first in Mr. Strauss' office. It was lying on the desk there. I read it myself there. I don't recall whether it was read aloud or not. Miloslowsky read it. After he read it, nobody signed it, but Miloslowsky said he would take it home with him and read it again and consider it over night before he determined what he would do with it. Mr. Howe: With the understanding that he was going to take it home with him and read it over and consider it over night before he determined what course he would eventually pursue? The Court: Tell what he said. A. Well, I recall that he said he would take it home with him and reconsider it and let me know in the morning. I didn't see him any more that evening. I don't know when the date of that was.

He testified still further as follows:

I saw Mr. Miloslowsky the next day. In regard to Exhibit 3, he came in my office in the morning and told me that, in the lease between the Youngerman Estate and Frankel, Frankel was to furnish the heat, and, in case Mr. Frankel was in any way to fail. if I would not furnish heat, and I told

him 'No.' 'Well,' he says, 'then I cannot go ahead with the contract.' There was no further objection made by him at any time to this Exhibit 3 to me. When he came back in the morning, he did not have with him a paper which I had not previously seen. I don't remember ever having seen Exhibit 4, which you now call to my attention, before. I don't remember of those questions being discussed by me or those objections, only the one in regard to the heat. I don't remember that anything was said with respect to the repairs upon the building. I don't remember of the fact being discussed that there was a mistake in the second page of the proposed lease where the words 'second party' had been used where 'first party' should have been used. My recollection of these details is pretty clear in my mind. I very clearly recollect that they did not sign up a contract to meet the seven propositions that were embodied in the document that Mr. Strauss had, and I did not sign it either.

Exhibit 3, referred to by these witnesses, is the written paper prepared by or for the Youngerman Estate, which we have already quoted.

This is all the material testimony upon what we regard the controlling issues in the case. There is no testimony that "the pillars could be removed so as to make a suitable room for the moving picture business," and no testimony as to whether or not the city of Des Moines would grant a license for a moving picture show in the building. It is apparent that no written lease has ever been signed by the parties hereto, and defendant did not, at any time, sign Exhibit 3. He has refused to sign either paper, and, if plaintiff has any cause of action, it must be upon the original memorandum of agreement which was signed by both parties. That agreement in terms imposed certain conditions upon the plaintiff, and there is no showing that these have been complied with. Moreover, there is no affirmative showing, as we have said, that the pillars could be removed from the room. There is no testimony showing that plaintiff was at any expense because of the execution of the preliminary agreement; and this agreement expressly says that part of the consideration should not be paid

until a lease was executed satisfactory to both parties, and no such lease has ever been executed. The only testimony as to damages tends to show that the rental value did not exceed $2,500 per year.

Both parties contemplated that a written lease should be executed in the future, which would be satisfactory to both parties; and it affirmatively appears that no such contract was ever executed. Plaintiff contends, however, that it is entitled to damages because defendant refused to execute a lease in accordance with the terms of this memorandum of agreement, through no fault of the plaintiff; and that it performed all it agreed to do under this agreement. In other words, it counts on the breach of an agreement to make a subsequent agreement, which later agreement was never in fact made. In order to recover on this theory, plaintiff must show that he did all that was required of him under the terms of the agreement, and that defendant should, by the terms of the preliminary agreement, have made and entered into the lease as agreed; and, if he has shown these things, he is entitled to damages, for the breach thereof, the difference between the contract price, as agreed upon, and what the lessor was able to realize out of the property after he was notified that the defendant did not intend to take it. *Post v. Davis*, 7 Kan. App. 217, (52 Pac. 903) ; *Cleveland v. Bryant*, 16 S. C. 634.

A definite written agreement to make a lease upon certain fixed terms and conditions is binding upon the parties, although no formal lease is ever executed; but, before either party may rely upon such an agreement, he must show that all the conditions on his part have been complied with, that the minds of the parties met upon all the terms and conditions of the intended lease; and it must also appear that the proposed lessee was at fault in not making the lease. *Pratt v. Railroad Co.*, 21 N. Y. 308; *Vassar v. Camp*, 11 N. Y. 441; *Sanders v. Pottlitzer Co.*, 144 N. Y. 209, (39 N. E. 75, 29 L. R. A. 431, 43 Am. St. Rep. 757) ; *Mayer v. McCreery*, 119 N. Y. 434, (23 N.

1. LANDLORD AND TENANT: agreement to lease: validity.

E. 1045). The law upon this proposition is clearly stated by Selden, J., in *Pratt's* case, *supra,* as follows:

A contract to make and execute a certain written agreement, the terms of which are specific, and mutually understood, is, in all respects, as valid and obligatory, where no statutory objection interposes, as the written contract itself would be, if executed. If, therefore, it should appear . . . that the minds of the parties had met, that a proposition for a contract had been made by one party and accepted by the other, that the terms of this contract were, in all respects, definitely understood and agreed upon, and that a part of the mutual understanding was that a written contract, embodying those terms, should be drawn and executed by the respective parties, this is an obligatory contract, which neither party is at liberty to refuse to perform.

One of the controlling questions in the case is: Did the minds of the parties meet upon all the terms and conditions of the proposed lease, or was something left to future negotiations, upon which the minds of the parties never met?

It seems to us that the original proposition contemplated an agreement with the owner to the subletting, which agreement was never in fact executed, and that defendant, while expressing satisfaction with the proposed agreement of the owner, at the same time refused to execute it, until he had time to think it over, and that, after reflection, he refused to accept the terms proposed by the owner as a condition precedent to the making of any binding lease. Moreover, the agreement contemplated the execution of a lease satisfactory to the defendant, and he was so dissatisfied with the one prepared and with the terms proposed by the owner that he refused to enter into the lease.

The agreement contemplated a consent to the subletting by the owner, and the owner never agreed to the subletting on the terms proposed by the defendant, but exacted conditions additional to those found in the original agreement, and to which defendant did not consent. The original agreement did not fix these terms, and defendant was at liberty to reject them.

2. SAME: agreement to lease: breach.

The original agreement was more like an option to the defendant than a complete, certain, perfect, and binding contract, and at no time did defendant enter into an agreement with the owner consenting to the terms imposed by him upon the proposed sublessee. In such case, no complete and binding contract is made. *Mactier v. Frith,* 6 Wend. (N. Y.) 103, (21 Am. Dec. 262).

The controlling question, in cases of this character, is whether or not there was a final consent of the parties, so that no new terms or variations are to be inserted into the final

3. Same: agreement to lease: when effective.

writing to be prepared. Again, it is a well-recognized rule of law that, if the parties understood there was to be no contract until a formal written one was executed, there is no contract until this provision is complied with; and, if the parties stipulate for a formal written agreement expressive of their intention, there is a strong presumption of no contract until the formal instrument is prepared and executed. *Lyman v. Robinson,* 14 Allen (Mass.) 242; *Allen v. Chouteau,* 102 Mo. 309, (14 S. W. 869); *Irish v. Pulliam,* 32 Neb. 24, (48 N. W. 963); *Methudy v. Ross,* 81 Mo. 481; *Lynn v. Richardson,* 151 Iowa, 284; *Weitz v. Des Moines,* 79 Iowa, 423; *Slade v. Lexington,* 141 Ky. 214, (132 S. W. 404, 32 L. R. A. (N. S.) 201).

Again, the plaintiff did not show compliance with all the provisions of the contract on its part, and produced no testimony to show that it had built the partition which it had

4. Same: agreement to lease: breach: evidence.

agreed to do, and failed to show that the pillars could be removed, or that there was any mutual agreement or meeting of the minds as to the remodeling of the building. In addition to this, there is no testimony that the defendant agreed to the owner's conditions expressed in Exhibit 3 as a prerequisite to its consent. This he was not bound, under the original contract, to do, and the plaintiff had no control over these conditions.

True, as we have said, defendant expressed satisfaction therewith, but, before becoming bound, he expressly refused to

accept. We are of opinion that there was no binding contract between the parties.

Plaintiff relies upon a waiver or estoppel on the part of the defendant in that he did not place his objections to the lease and to the conditions for consent by the owner to sub-

5. SAME: agreement to lease: estoppel.

letting, upon any ground now insisted upon. The rule relied upon has reference to a breach of a contract and not to the question as to whether there ever was a meeting of the minds, so as to make a valid, binding, and enforceable contract. A contract may, perhaps, be created by estoppel, but not such a contract as is here declared upon. Defendant had the absolute right to refuse the conditions imposed by the owner in consenting to the subletting, and if he did this, no matter what the grounds of his objection, there was no meeting of the minds. The case might, perhaps, have been decided upon failure of proof of proper damages; but, as the decision did not go on that ground, we shall make no pronouncement upon the proposition.

The motion seems to have been correctly sustained, and the judgment must be, and it is—*Affirmed.*

LADD, C. J., and GAYNOR and WITHROW, JJ., concur.